It pleased the court. The jury weighed extensive evidence during a four-day trial and made findings that are accorded great deference. Uretek breached a sub-license agreement validly granting exclusive territorial rights. The jury could reasonably infer that Uretek's misconduct caused Ureleft to lower its price for the four projects and to miss out on the stabilization process that only Ureleft rightfully provides. But for Uretek's breach, Ureleft would have been the only source for that process in Mexico. At every juncture of the district court's opinion on lost profits, there was conflicting evidence that supported the jury verdict. As to liquidated damages, the provision easily satisfied the Phillips factors for enforceability and, as the district court found, Uretek waived the penalty defense by omitting it from the pretrial order and yet again from its Rule 50A motion. The district court also properly found that Uretek waived its attorney fee defense. Uretek did not mention the Covenant Not to Compete Act in the pretrial order. Instead, Uretek submitted an agreed proposition of law that attorney fees are available under the Texas Civil Practice and Remedies Code for breach of contract. That's page 1365 of the record. And despite plaintiffs' contention stating that plaintiffs are entitled to recover reasonable and necessary attorney fees from Uretek per the terms of the sublicense agreement, Uretek did not dispute the contention and submitted no contested proposition of law or facts on the Covenant Not to Compete Act or attorney fees aside from stating plaintiffs' tort claims do not support an attorney fee. Okay. So as to the four projects, the evidence showed that Uretek-backed competition was responsible for Ureleft receiving that low price. And the court reasoned that Ureleft could not have been damaged by the Uretek-backed competition because also came into the marketplace as a bidder in September 2015. However, there was conflicting evidence on that point. In fact, Uretek-backed competition, the record shows, had an active presence in the marketplace before any of the four projects were awarded. Where is the evidence that this active in Korea and what not was competing in Mexico during the relevant time of those four awards lower than they wanted it to be? Sure. There are several pieces of evidence. I'll point out pages of the record 3465 through 367 and 3171 through 72. And that's evidence of the Uretek CEO meeting with Mexican counterparts, including the former disgruntled independent contractor of Ureleft between July 2013, that's before any of the four projects were awarded, and October 2014 about pursuing Mexican projects. And then there's some very interesting and compelling evidence on pages 2441 through 2442 that Uretek-CEO is actively bad-mouthing Ureleft and its work product to Mexican government officials. And the email notes that the Mexican government already knows that the presence of Uretek-CEO in Mexico is as our consultant. And actually, also interestingly, in that email, they note that the government says because of the job done in December 2009, that's the STC projects that Ureleft had done. Because of that project and its great post-injection results, the government is convinced that this is the right process and that it is willing to award a direct contract for use of that process. So that's another piece of evidence. And then, you know, again, there's also evidence that at least as far back as 2009, no company other than Ureleft and also were able to complete soil stabilization projects in Mexico, much less use anything like the Uretek process. And that's page 3081 of the record. And as to evidence, besides all that direct evidence, you know, circumstantial evidence has just as much weight, of course, as direct evidence and can be used to prove any ultimate facts. As to the Chultepec project, you know, here, speaking of conflicting evidence in the record, the district court set up its own litmus test that there must be evidence from a Mexican government official about the award. Such evidence could have been helpful, but its absence was by no means fatal. The project was awarded to also, as we know, a Uretek-backed company through a direct bid as the sole source for the Uretek process. And the government found that process to be suitable, of course, and didn't invite competition. So absent Uretek's breach, Ureleft exclusively supplied that soil stabilization process that the government wanted for the project. And again, as I noted, we have evidence that at least as far back as 2009, no other company other than Ureleft and also could complete these kinds of projects or use the Uretek process. That's page 3081 of the record. You know, it's kind of like Coca-Cola. They opted for Coca-Cola. If there's only one source for Coca-Cola, you know, that can provide Coca-Cola, then anyone who needs or wants Coca-Cola is going to have to get it from that source. And here is the Uretek process. And the only source, the only rightful source for the Uretek process is Ureleft. So absent Uretek's breach, Ureleft would have exclusively supplied that process that the government wanted. And again, I'll point to pages 2441 through 2444 of the record where the government also notes that the government actually, the government wants this Uretek process and is willing to award a direct contract for use of that soil stabilization process that, of course, rightfully provides per the sublicense agreement. It's because somebody has a sole source contract, which occurs in government contract and all the time when there's only one source. But it's rarely in perpetuity, you know, so that if you've got a sole source, it means you're entitled to that for now and forevermore. People ultimately get in the marketplace and then there's competition. So because you're a sole source at one point, doesn't mean, well, you know, you get that all the time and then they claim profits because of that. I mean, the argument seems to run through as if sole source forever and anything to the contrary is wrong. Sure. Actually, the argument is not that sole source in perpetuity is what is warranted or needed. The argument is that the jury was entitled to make reasonable inferences. And there is plenty of evidence in the record that the only proper source, the only rightful source for the Uretek process, the only one that could actually provide this process was Ureleft. And that's what the government wanted. You know, the government says that, you know, government sees the history of Uretek successfully completing its projects. We have that again on pages 20. One thing, we don't have any jury charge issues on appeal, right? So, I mean, this thing is prior to the jury on all these claims overlapping, yada, yada, them understanding the drilling process and on and on and on. So nobody's claiming that there was a bad jury charge that sent the jury down a rabbit trail or whatever, whatever, right? So it's just you both have your differing views on what the jury should have, could have, did decide on the evidence, right? There are no issues on appeal about the jury charge. And, you know, the problem here is the district court substituted its own inferences that it found more reasonable for the jury's reasonable inferences. And, of course, the jury is entitled to make reasonable factual inferences that support the verdict, and it did. And at every juncture of the district court's opinion on lost profits, there was conflicting evidence that supported the jury verdict. There was certainly evidence that the government wanted this process, that only Ureleft could rightfully provide for its soil stabilization processes, and that it would choose. And it did choose that process again and again. The same thing happens with Metro Linea A. The government awarded that project to Also. But for Also's presence in the marketplace, and that's a Eurotech-backed company, Ureleft would have been the only company that could provide the process that the government wanted and that the government chose. Well, I grant you, you know, we generally give high deference to a jury for absolutely perfectly good reasons, but the rules of procedure certainly provide that the district judge can, you know, take away that if it deems, you know, it's just not based however perfect the jury charges were, and so on and so forth, if it is not . . . And lost profits is always problematical for us in a whole range of cases, because it can be somewhat nebulous trying to figure it out, whether you've got CPA and this and that and so on and so forth. So I hear you, and I guess it's something we have to read a lot of records, saying that the jury had ample emphasis, but tell me how the trial judge was paying rapt attention when this same evidence is going to the jury, but whatever felt like there was not ample evidence on the lost profits for the jury to get there. So how do we conclude, other than you saying so, that the district court pushed the button and shouldn't have to take away the jury . . . I mean, it's not the case just because the jury does something, you know, it just goes, no matter how much difference, right? But on the other hand, you've got a fair point, the judge should let it be there or not. So just go straight to the juggler here, where the judge derailed, should have kept the hand off the button and let it . . . on the lost profits. What is so inescapably true about the lost profits here, that we'll say the judge erred by taking the lost profits away? Do you follow me? What report in the evidence, what CPA's testimony, what deposition, what . . . so when we look at this, we'll say, well, we don't know how the judge could have read this and not concluded. You follow what I'm saying? Sure, sure. So the point is to where the judge should have seen it the way you did. Sure, sure. And interestingly, in the district court opinion, the judge highlighted only certain evidence. And it highlighted the evidence that may have, you know, that it thought supported its own inferences, but there was other evidence supporting the jury's reasonable inferences. And if I have to point you to some of, you know, to some compelling pieces of evidence, um, you know, I've, I've noted some already. I will also say for the Metrolinia A project, for example, which I haven't discussed yet. Again, I, I think actually the most, one very compelling piece of evidence, time and again, for Metrolinia A to Pultepec again and again, is that the government chose this very process. Okay. The government, and we see on page 2441 through 2444, government specifically wants that Eurotech process. Okay. The government wants that Eurotech process and it is awarding, it is awarding for Chapultepec a direct bid based on that process. And in fact, um, reports to also in 2441 through 2444 that the direct process will be available for this Eurotech process because it totally works for our soil stabilization processes. The only company that can do that rightfully is Euroleft. So you get the Eurotech bat competition out of the market and only Euroleft is left. And for Metrolinia A in the meantime, you see this evidence that just even just days before the project is awarded, Eurotech is still out there and also its bat company are bad mouthing Euroleft to the Mexican government officials. There's actually an email from the Eurotech CEO, um, and this is, uh, 4149 through 50 of the record, sending the government a letter denigrating Euroleft's integrity and work products and implying that Euroleft did not have exclusive rights to that Eurotech process in Mexico. And that is the process that the government's choosing and selecting. So the jury could rightfully say, okay, well, we see the government wants this process. Government says it wants, needs that process. And the only company that's going to be able to provide that process is Euroleft. So that's, you know, that's one way that we get there. That's one of many pieces of evidence supporting the jury verdict. Um, you know, and if, if you want to hear about disqualification, uh, of the bid for Metrolinia, many Metrolinia A, as I mentioned, there's the, you know, bad mouthing Euroleft just days before. And, uh, the reasons are basically omissions of which wouldn't have been possible, but for Eurotech's breach and Comte de Empte's, which was disqualified. Um, and there's evidence in the record that Comte de Empte never completed a soil stabilization process like Metrolinia A. That's 3081 through 82 of the record. It's reasonable for the jury to conclude that Comte de Empte was not qualified for the project. Okay. As for liquidated damages, unless, unless there are more questions on any of these projects, sure. Um, well, the provision easily met the Phillips factors for enforceability. Record shows that at the time of contracting, the harm caused by the breach was difficult or incapable of termination. We have evidence that UDM is a holding company with no active business operations, that the Eurotech CEO and president admitted that the exclusive right to sell the Eurotech process and Eurotech products in Mexico had value. And again, we also see that UDM paid good value for these exclusive rights. It paid a license fee, other pieces of evidence are 2574 through 75 of the record, 3003, 3008, 3167, 3312. Um, the amount called for was a reasonable forecast of just compensation. It's tied directly to the offending sales calling for just a fraction, half of gross revenues. This isn't Phillips, you know, calling for a tenfold multiple of actual damages. Um, Eurotech did not at all establish any unbridgeable discrepancy between liquidated damages and actual damages. You know, on appeal it simply states that there are zero actual damages, um, which contradicts its own principles, testimony that the rights, exclusive rights had value and contradicting its own position in district court that damages were capable of determination because, uh, Blacker estimated UDM's damages to the penny. Um, you know, of course, Eurotech later realized that these were actually Eurolef's lost profits that were, that were awarded, so it had to change its, that were calculated, so it changed its tune on appeal. Um, also district court properly found, and it has broad discretion in finding, that Eurotech waived its penalty defense by omitting the issue from the pretrial order, and then yet again from the Rule 50A motion. Eurotech contested propositions of fact, law, didn't state whatsoever that the issue in the pretrial order? It actually didn't. The only slight reference to liquidated damages in the pretrial order was plaintiff's damages claims show liquidated damages cannot be awarded. There was no mention whatsoever that liquidated damages were a penalty, were an unenforceable penalty, and of course this court has held in Flannery and Allen and time and time again that a district court has broad discretion in narrowly construing a pretrial order. Here it's not even close. The issue just wasn't raised at all. So you like what the judge did about the liquidated damages and his waive, but you don't like what the district court did to snatch the profits away, is that it? That's, that's totally right. All right, it's a good place to be. But the snatching the jury charge is a de novo review, not an abuse of discretion like the other ones, right? Okay, so abuse of discretion, waiver issues are abuse of discretion, and that's . . . Right, but the, the snatching the jury, that's de novo, the question of insufficiency of the evidence. Exactly. While we respect the district court greatly, we don't have to give any deference to that finding, right? Exactly, exactly. The, the, the district court's factual findings on lost profits are subject to de novo review, as opposed to its, its conclusion of waiver for both the liquidated damages penalty defense as, as well as the attorney fee defense. Those are both reviewed, reviewed for abuse of discretion, and . . . You have a red light. I was trying to put a period behind it, but Judge James gave you a plus plus to end on, so it's all good. But you've reserved your rebuttal time, so thank you. All right, Mr. Kowalski. Yes, Kowalski. Kowalski, I'm sorry. Thank you. Good morning, and may it please the court. The district court was absolutely right to grant judgment as a matter of law on Urolift's claims for lost profits. For each of the three different elements of lost profits the jury found, there was no evidence of a crucial element, and that is causation. Starting with the four projects that Urolift actually got, there, there is simply no evidence in the record whatsoever that can be either directly, or that a reasonable inference can be drawn from, that also, or Eurotech had anything to do with the bidding on the, what's called the four projects. Did you try to use . . . I did not. Neither of us did. All right. That's fine. I'm sorry. And I was just going to say, the argument about there being a lack of evidence is an argument you made before the jury, or someone made at the trial before the jury on your claim. That's absolutely true. We argued that there was no evidence of, that they didn't prove that anything Eurotech did caused them to get a depressed price on the four projects. Certainly true. And despite that, the jury made a finding to the contrary. It did. And, you know, why it made that decision? Perhaps it was unhappy with the defendant's conduct in the case. We don't know, but there still has to be evidence from which a reasonable inference may be drawn. And here, you know, the principal of Eurotech testified . . . Do you think the jury was properly instructed on the law in connection with that issue in the case? I'm not taking any issue with the jury charge, Your Honor. It is simply . . . So the jury was properly instructed. They heard every argument you had to make about why the lost profits shouldn't be awarded. That's certainly true, Your Honor. They did hear those arguments, and they were . . . And they made an award. They did. But that doesn't mean that there's not a rule for the judge where sometimes juries get it wrong. And as an example, I'll point to this Court's decision in Tercero earlier this year. The jury there awarded $12 million. The district court granted judgment as a matter of law on a number of issues, one of which was that it was speculation that the defendant's conduct caused the plaintiff to not get a new job. The plaintiff said that's what caused it. The district court granted judgment as a matter of law, took the issue from the jury, and this Court affirmed. And here, you know, people from Eurotech testified at trial, people from SPI testified at trial, people from also testified at trial. Notably, plaintiff's counsel at trial never asked any of them if they made a bid on any of the four projects. If they thought so, why didn't they ask the question? There is not a single piece of paper, a single piece of testimony anywhere in this record that suggests that also had any knowledge of the four . . . What about this ROA 2441 email? I haven't had a chance to read the whole thing right now, but I pulled it up. She argued that this showed that y'all were competing during the four awards, the lower price awards. So and I don't recall . . . The May 2014 email with Brent and Luis Fernando. So the May 2014 email, there were communications starting in 2014. That's true. But what you don't see is any communication regarding any of these four projects. There was certainly communication regarding the Metrolinia A project. We don't dispute there was evidence of that in the record. But a jury cannot infer, because you were talking about this project in Mexico City, we can just infer that you were doing something over here about a project in a different state in the state of Jalisco. That's a bridge too far. And that's speculation. And that's . . . The district court was . . . But I mean, if Mexico thought that Eurolift was the only place it could get this stuff that they liked, and then they found out, no, we can get it straight from the guys that make it, that would make a difference in their approach, wouldn't it? And so if you make them aware of that in this email, et cetera, doesn't that start to get us down this path of you are competing and you're kind of throwing them in the bucket? No, Your Honor, because we're talking about different governments in different cities and different states. The 2009 award . . . In Mexico. I mean, yes, they were in the country of Mexico. I agree with that. But they got a project in 2009 to stabilize a rail line in Mexico City. The four projects, the two SIOP projects that were awarded in 2013 and August of 2014, are in a small city in . . . which I cannot pronounce . . . in Jalisco. And the GFB project, the fourth of those projects, wasn't a government contract at all. As Mr. Blacker, plaintiff's expert, testified at 3417 and 3418 of the stabilizing some houses. And what you . . . and there's no . . . there's simply nothing in the record anyway to suggest that ALSO had anything to do with that. Whatever evidence there may be about dealings between SPI and ALSO or Eurotech and ALSO, the key factor that they had to put evidence in is that ALSO did something with respect to the four projects. And, again, plaintiff's expert, Mr. Blacker, at 3415, agreed that if ALSO wasn't competing for those four projects, then Eurotech did not cause any harm. So that's the key problem. Whatever's . . . You're saying just showing some yapping around isn't enough. You have to show that they were actually trying to get the projects. That's right. There was . . . you know, Mr. Alvarez-Urliff's corporate representative repeatedly testified, we had competition on the four projects. And he would then try to say who it was. And every time, the objection was sustained on hearsay grounds. And he said, well, we've got papers that show it. And as the district court noted, that paper never came into evidence, never arrived. There's simply nothing there to show that ALSO was involved in these four projects, nor . . . And would you agree with your opponent that they did not have to put on Mexican authorities as witnesses? There are other ways to prove what they're trying to prove. Whether they proved it or not, is it your position they had to put on Mexican authorities as witnesses? Do you mean like testimony from the relevant decision makers or . . . Yeah. I mean, get somebody from Mexico to come in and say, oh, yes, we would have paid more but for ALSO applying or whatever. Well, I mean, the Texas Court of Appeals and Toshiba Machinery Company versus SPM Flow Control, 180 Southwest 3rd, 761 at 779, certainly made that exact point that the best way to do this is to say, go ask the customer. Well, I understand the concept of the . . . Of course, if they had brought in this Mexican authority and they had said that, we would not be sitting here. I get that. But that's not the question. The question is, did they have to do that? Not would it have been a good idea? If you're asking, did they have to have direct testimony, the answer is no. If they had e-mails or documents saying . . . And you're saying this e-mail isn't good enough. No. That e-mail shows that Eurotech and ALSO are talking in May of 2014. The key thing that is missing as to the four projects is it doesn't show that ALSO bid on those projects. There is nothing in the record to show that ALSO knew of those projects, that ALSO bid on those projects, that the decision . . . that ALSO had anything to do with those projects. And plaintiff's expert at 3415 admitted that if ALSO wasn't competing for the project, then Eurotech didn't cause the harm. And that's the problem. And I think it's an important thing to note. In order for the evidence to be sufficient to support the jury's finding on the lost profits, the 6.11 million, they have to show sufficient evidence of causation as to all four of the projects. Because 6.11 million was 100 percent of the damages that plaintiff's expert said was caused by the price reductions on all four projects combined. So even if the evidence is sufficient as to . . . on causation is sufficient to any one of those four, the motion for judgment as a matter of law ruling was absolutely correct. Because if one of those projects falls out, then you don't have all four projects there and you can't support the 6.11 million. But then you wouldn't . . . you would get perhaps a new trial or you would get it remanded to the district judge to allocate that. Not on this record, Your Honor. They chose . . . plaintiff's trial counsel only put in the lump sum number. They did not choose to put in the individual numbers of the four. Moreover, plaintiff's counsel . . . Well, I would say two things. Well, it's not that if you don't prove all the damages, you don't get any. But here, I would point out two things. First, the court of . . . in their brief, the only relief they seek is entry of judgment on this verdict. They haven't sought any alternative relief. Second, here the plaintiff's trial counsel essentially invited the air. Plaintiff's trial counsel asked for the breakdown of the jury findings to be the four projects, Chapultepec, Metro-Linnea A. And then the district court did that. And Judge Johnson then asked the parties, does anyone have any objections to the form of the charge? And plaintiff's counsel asked that issue, said no. Okay, but what case says if you did that and you proved three of the four but not the fourth that you lose all four if you put them in the bucket, in one bucket? Your Honor, I cannot point you to a specific case. But what I can say is when you choose . . . if you make a tactical decision to go all in and mix everything together, should another trial have to be held to redo the evidence and make another jury sit and figure this out? They made a tactical decision to present their evidence this way. And that's the record we're left with here. But to be clear . . . Wait, when you said present the evidence that way, I thought you were talking about a jury charge in terms of how they asked for damages to be allocated. Two separate things, Your Honor. And I was unclear. I apologize. All right. During the evidence . . . when evidence was introduced, the only way they chose to put in evidence as to the four projects is they just said, the four projects, $6.11 million. They did not put in evidence on a project-by-project basis. So then when it comes to the charge conference, they said . . . they asked the court to not just have a single general verdict on damages, but asked to separate it out. They asked for a finding on the four projects together. They didn't say, we want separate findings on each of the four projects. The reason they didn't ask for that is they hadn't put that testimony in at trial. That's how it matches up. So you're saying that's the problem. There's the lack of testimony. Correct. But the more fundamental issue is the one that Judge Johnson identified after an exhaustive discussion of the testimony. There is simply no evidence in this record as to the four projects that also had anything to do with them. And if also didn't make a bid or have anything to do with it, that breaks the causal chain. Moving to Metrolinia A . . . So when counsel argued to the jury, they just argued the global . . . you know, the global claim. It wasn't broken down in their argument either. That's correct, Your Honor. During closing, they just said $6.11 million and left it there. There was testimony that the GFB contract, that was the private deal, that wasn't a government contract. The damages to that were only about $29,000. That was the last of the four. That was the May 2015 project. So presumably the other damages are attributable to the first three projects between October 2013 and August 2014. So you're the opposite of your opponent because you want us to affirm on something where it's a de novo review, but you want us to reverse on the things that are abuse of discretion. So talk to us about that. Sure. And I'll take a partial issue with one of the two issues that I'm raising here being subject to abuse of discretion. On the liquidated damages, it is our position that the 50B ruling, denying our motion for judgment as a matter of law, that the liquidated damages were unenforceable, that that ruling is ruled de novo. In that ruling, the district court made no waiver findings. What happened is the district court ruled... But if you don't raise it in 50A, then you can't raise it in 50B. Your Honor, I'll say two things there. First, we did raise it at 50A. We discussed that in our brief. What happened here is before trial, the court said parties submit a joint pretrial order and trial briefs on March 1st. In that joint pretrial order, this is at 1153 and 1157 of the record, and it's also found at 1361 in tab 18 of our record excerpts, there was a general statement of a contested issue of fact, whether UDM is entitled to recover breach of contract liquidated damages from Eurotech for Eurotech's breaches of the sublicense agreement. In the trial brief filed contemporaneously with that, we had four it was an unenforceable penalty that they failed to meet their burden to show that it's enforceable. At 50A, it was an oral motion, and we just referred back to our brief. In 50B, we raised it again, and the plaintiffs responded, but never raised the fact that we hadn't raised it in 50A. And this court has held that you can waive the waiver in this context. If the nonmovement doesn't oppose 50B on the grounds that it hadn't been raised in 50A, then you waive the waiver, and we cite that case law in our briefing. But the more fundamental issue is we did raise it at 50A. We referred to the trial briefs, and that's at 3426 of the record. And to show that the district court understood that, I would point the court to a subsequent colloquy later that day at 3484 of the record, and this is when we're talking about the jury charge. And counsel for Eurotex told the court, but I think we're going to object to any damages, and then liquidated damages, for the reasons in the brief, one of which is, the judge, Johnson, interrupts, cuts and says, right, well, you've preserved that. The first time the district court suggested that it hadn't been properly raised in the pretrial order, or at 50A, was after judgment was entered and after the 50B motion had been ruled on. Three weeks after the district court entered judgment, a new case came from the Texas Supreme Court called Atrium, and Atrium clarified what was unclear in the law before. And Atrium made clear, among other things, that it is the party seeking liquidated damages, it is their burden to prove that the measure of liquidated damages in a contract is a reasonable estimate of the damages. And there is no evidence of that in this record whatsoever. The only evidence we have is the formulas in the contract. Here's how the math works. Unlike Atrium, where they said 40%, you know, we looked at our historical profit margins and the franchisor's historical margins, there's nothing here. So to get back to your original question, Judge, I don't think the court's review of the 50B at all. Had we not filed a 59E motion and just said, instead of giving the district court a chance to fix it, we just waited to come up here? I don't think we're talking about the pretrial order or the 50A motion, because the district court didn't make those types of rulings in her ruling on our 50B motion. She just got to the merits and ruled against us. I would like to turn briefly back to lost profits, particularly the Metrolinia A project. As the Texas Supreme Court held in Horizon, it is not enough to show that someone got the project who wasn't supposed to. You have to also show that as a plaintiff, you would have received the contract. Now, there were three parties that bid on the Metrolinia A project. Also, Eurolift and Comsa Empte. Two of those bids were disqualified, including the Eurolift bid. For 14 independent reasons set forth, and you can find that document at tab 17 of our record excerpts, which is also at 4545 of the record. That is the only evidence in this record of why the governmental authority in Mexico made the decision it did. Eurolift wants to say, well, maybe that was a pretext. First of all, there's no evidence to say it was a pretext. They just want to say, well, we don't believe what the government said. The only evidence of what the government said, the decision maker said. But the key fact is, even if the jury chose to say, you know what, we see that's what the decision maker put in writing, but we just choose not to believe that. As the Supreme Court held in the Bose case, simply discrediting that testimony doesn't mean you can infer the opposite. And the fact is, there's still no evidence that Eurolift would have got the job. There's a presumption baked into their argument, which is that all these jobs could have only been done with the Eurotech process. Again, there's no evidence in the record to say that. We don't have the engineering specifications. We don't have the bid requirements. With respect to the four projects, with respect to Chapultepec, there's nothing saying, with respect to Metro Linea, there's nothing saying it has to be the Eurotech process. They simply are arguing, because that's what was awarded, that must have been the only thing the government would have accepted. But there's, you can't just, there's no evidence. And I would point to what the district court's colloquy with plaintiff's counsel at 3438 to 3439 of the record. And she specifically asked, where's the evidence that Chapultepec and Metro Linea were choosing a particular process for stabilization? Plaintiff's counsel's answer was, well, you can presume it. We cite that colloquy also at page 41 of our brief. But there's a fundamental gap as to the four projects. There's no evidence that Eurolift had, or excuse me, also was bidding on them. They were the competition. We don't know who it was. And just because also may have been doing something over here, it doesn't mean they were doing it in a different state. And without also being involved in the four projects, there's no causal link back to Eurotech. Because as their own expert testified, if also wasn't the competitor, there's no way Eurotech could have caused the harm. So that's the fundamental problem we have here. Juries certainly have the right to draw reasonable inferences from the evidence. I don't deny that. That's clearly the law. But there is a limit to what inferences can be drawn. And here, the evidence went past that point as the district court correctly found in her 30-some page ruling that went through the evidence. Unless the court has All right. Rebuttal? I'd just like to make a few points now. One, there is evidence that the communications between the CEO of Eurotech and the Mexican counterparts, including the disgruntled former independent contractor of Eurolift, started in 2013. And that's on 3171-72, the record, and 3465-67. And that's before any of the four projects were awarded. I'd also like to point out a statement was made about having no separate evidence on damages or anything on the four projects. And I would point to page 4206 of the record where it actually states the price of polymers, well, where it states the price of polymers received for each of those four projects. Counsel mentioned the Tercero case. And I'll note that the plaintiff there did not name, explain, or describe the position she'd applied for or what its qualifications were and concedes that she was a finalist for the position. So that case is not on point and certainly does not help opposing counsel. And as they've acknowledged, the jury is entitled to make reasonable inferences from the evidence. And here, there was extensive evidence. And, of course, circumstantial evidence is just as powerful and has just as much weight as direct evidence. And we've got both in spades here. As for liquidated damages, the district court properly exercised its discretion to find that URTEC waived its penalty defense in the pretrial order yet again. What about the briefing, that it was in the brief and they referenced it? Because, you know, he's sitting there in trial and the judge just kind of wants to get through the 58s. Okay, I refer to my brief. Why isn't that good enough? Okay. Well, first of all, as to both the pretrial order and the pretrial order, it's just not in there, right? URTEC contested propositions of fact and law, state nothing whatsoever that the imposition of liquidated damages would be a penalty. There's a vague reference. Yes, later there's a vague reference to some earlier pleading. This pleading is not actually even identified. And, of course, you know, a trial brief is not the same as a pretrial order, nor is a trial brief a Rule 50A motion and no written... So you're standing there and the judge says, all right, we need to get going. Okay, what's your 50A? Go ahead and please get to it. And you're... So you go, well, Your Honor, I adopt by reference my brief of, you know, March 2. And the judge says, okay, thank you. I'll take it under advisement. All right, what about you? Okay, now we move on. Why isn't that good enough? Okay. Well, if we're talking about this is now the 50A motion. So it's already been waived in the pretrial order. But once we get to the 50A motion, there's a statement. And they actually extensively discuss liquidated damages, but just don't make these arguments, right? There's no discussion that, you know, the damages provision is unenforceable based on a lack of proof under the Phillips factors. There is... They do state, as to contractual damages, we filed a brief on that. They don't state what brief, when, where. And under Montano, this Court says that objections in a 50A motion need to be specific. Here there's a vague reference to some earlier unidentified pleading. And, in fact, if you even, you know, even going to that brief, again, the argument is different than their argument on appeal. Because over there they're stating that damages can be calculated because EuroLift's expert and UDEM's expert calculated damages. Of course, those are lost profits of EuroLift and not UDEM. And so here, on appeal, they recognize that and then make a completely different argument about being able to forecast damages. Okay, and also I would just briefly mention on attorney fees, I know I've discussed that a bit at the beginning, but also, interestingly, your text stated on page 63 of the record in its answer that the prevailing party in litigation relating to the sub-license agreement shall recover its attorney fees. And then, yet again, I would also note, as we've stated over and over again in our briefing and otherwise, the case was not tried under the Covenant Not to Compete Act. No mention of this act. And, in fact, Texas Supreme Court has said that, has generally defined covenants not to compete that are subject and governed by the act as covenants that place limits on a former employee's professional mobility or ability to solicit former employers, customers, and employees. That's the Exxon Mobil case at 452 SW 3rd 319. You know, obviously, that is not at all what we have here. Are there any other questions that I might help to answer? No, I think we've got it. Obviously, there's a lot of record territory to cover and we'll cover it. There are some key matters that, not surprisingly, the two sides differ over what the record says, so we'll look at it closely and make the calls on the issues. So thank you for your briefing and argument. Thank you, Counsel, on the other side. It's an interesting case. To put it mildly, I now know more than I wanted to know about subterranean drilling and so forth, but that's a good part of this job. We learn about a lot of stuff that we didn't know we needed to know otherwise. So anyway, but it's an interesting case. Thanks so much. The case will be submitted. Thanks very much. All right, before we call the third case up, Shepard, Counsel can come on up to the table.